# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

NORFLEET BELL *v.* COMMONWEALTH OF VIRGINIA.

January 14, 1937.

Present, All the Justices.

The opinion states the case.

*Crumpler & Crumpler,* for the plaintiff in error.

*Abram P. Staples, Attorney-General,* and *Edwin H. Gibson, Assistant Attorney-General,* for the Commonwealth.

HOLT, J., delivered the opinion of the court.

On the night of October 1, 1933, in a suburb of the city of Suffolk, Norfleet Bell shot and wounded Henry Harris, who died therefrom in a short time. Harris, his brother Webster Harris, Joe Jacobs and Joe Williams were engaged in a crap game. During its progress Bell came up and Harris, who in fact had left his watch at home, charged Bell with stealing it and ran Bell from the game. Bell soon afterwards returned and was again chased away. The game then broke up and Harris and his brother went to their home, where his mother told him that she had his watch; then, with his brother, Webster, and another brother, Charlie, they went to a nearby store to buy cigarettes. On their way back and when near an oak tree by which Bell stood, Bell called Harris to him and shot him. The jury found the accused guilty of second degree murder and ascertained and fixed his punishment at twenty years confinement in the penitentiary. This verdict the court confirmed.

Joe Jacobs, a witness for the defendant, on cross-examination was asked if he had been in the penitentiary. He said that he had been there once and had been on the road once; that he had twice been convicted of a felony. Joe Williams, another witness, on cross-examination said that he had been sent to jail for stealing fish, while Jesse Boddy said that he had been convicted of stealing chickens. Due objection to the admissibility of all this evidence was made and overruled. This is the basis of the prisoner's first assignment of error.

It is not contended that the evidence is insufficient to support a verdict of guilty and so a more detailed statement is not now necessary.

Crime has been defined as an offense which the law punishes directly, and is classified as treason, felonies, and misdemeanors. Treason is but an aggravated felony, and so, for practical purposes crimes are either felonies or misdemeanors.

A felony is "an offense which occasions the total forfeiture of either land or goods at common law to which capital or other punishment may be superadded according to the degree of guilt." Petit larceny was ranked among felonies but under it lands were not liable to escheat. In a trial for felony the

jury was required to make a true deliverance between the crown and the prisoner at bar. In one for a misdemeanor, they were sworn to try the issue between the crown and the defendant. Forfeiture for felonies was abolished by 33 and 34 Vict. chapter 23, and many offenses which were felonies at common law have been made misdemeanors by statute. Enc. Brit. volume 6, page 520.

In Russell on Crimes, volume 1, chapter 4, is this definition of misdemeanor: "The word misdemeanor is applied to all those crimes and offenses for which the law has not provided a particular name."

When Hastings stood before the House of Lords, charged with high crimes and misdemeanors, certainly that tribunal did not for seven years mill over inconsiderable offenses.

It is plain that no comprehensive and permanent definition of these crimes is possible without the aid of a statute.

Crime may again be divided into those which are inherently immoral or injurious and into those which are not thus tainted but which rest in some statute which forbids their commission.

At common law those convicted could not testify.

"At common law, persons convicted in courts of record of crimes which render them infamous are excluded from being witnesses. 'Infamous' crime in this sense is regarded as comprehending treason, felony, and *crimen falsi*. In most jurisdictions, however, the disqualification of infamy is removed by statute, though a conviction may be proved to affect credibility." Wharton's Criminal Evidence, volume 1, page 30.

"Of such person Chief Baron Gilbert remarks that the credit of his oath is overbalanced by the stain of his iniquity."

"It was formerly thought that an infamous *punishment*, for whatever crime, rendered the person incompetent as a witness, by reason of infamy. But this notion is exploded; and it is now settled that it is the crime and not the punishment that renders the man infamous." Id.

Lord Chief Justice Holt in *R. v. Warden of the Fleet*, 12

Mod. 337, 341, said: "In respect to a person who had been burnt in the hand, if it were for manslaughter, and afterwards pardoned, it were no objection to his credit; for it was an accident which did not denote an ill habit of mind; but 'secus' if it were for stealing, for that would be a great objection to his credit, even after pardon."

Now, however, by statute in Virginia, Code, section 4758, the grade of the offense is fixed by the punishment. Those offenses punishable by death or confinement in the penitentiary are felonies and other offenses are misdemeanors, but no statute could affect their inherent nature, and so larceny, either grand or petit, is shot through with moral turpitude, and this outstanding characteristic is not changed whether the thief steals forty-nine or fifty-one dollars. Indeed by statute now, Code, section 4785, one three times convicted of petit larceny must be sentenced to the penitentiary. Of course repetition of an offense does not change its nature.

At common law simple larceny of goods above the value of twelve pence is called grand larceny; of that value or under it is petit larceny. Both were felonies. Bouvier's Law Dictionary, "Felony;" *People ex rel. Cosgriff* v. *Craig*, 195 N. Y. 190, 88 N. E. 38; 36 C. J., page 800.

If it be conceded that petit larceny at common law was a misdemeanor, we reach the same results. "An 'infamous' crime is one which works infamy in the person who commits it. At common law it was one which involved moral turpitude and which rendered the party convicted thereof incompetent as a witness." 16 C. J., page 60.

At common law, there was no distinction between grand and petit larceny except in the punishment, which was death in the one case and whipping in the other,—by statute extended to transportation for seven years. 4 George 1, chapter 11, 4th Blackstone, pages 229, 238. One convicted of either offense was an incompetent witness and this continued to be the law until 31st George III, chapter 35, which made misdemeanant convicts competent. *Barbour* v. *Commonwealth*, 80 Va. 287.

The crime was then no longer technically speaking "infamous" but was still base. Incompetent witnesses, of course, could be impeached, but it did not follow that a witness who was competent was unimpeachable.

In an act of the General Assembly, passed January 10, 1818, Code of 1819, volume I, page 517, it is provided, "That no person convicted of treason, murder or other felony whatsoever, shall be admitted as a witness in any case whatsoever, unless he be first pardoned, or shall have received such punishment, as by law ought to be inflicted upon such conviction.

. "No person convicted of perjury, although he be pardoned or punished for the same, shall be capable of being a witness in any case."

By statute of 1847-48, it is provided that "a person convicted of felony shall not be a witness unless he has been pardoned or punished therefor."

Again by statute of 1877-78, the Legislature dealt with this subject and said: "Except where it is otherwise expressly provided, a person convicted of felony shall not be a witness, unless he has been pardoned or punished therefor, and a person convicted of perjury shall not be a witness, although pardoned or punished."

This continued to be the law until the Code of 1919 was adopted. It declared, section 4779, that "conviction of felony or perjury shall not render the convict incompetent to testify, but the fact of conviction may be shown in evidence to affect his credit."

Crimes in Virginia, now classified as felonies and misdemeanors, Code, section 4758, have always been so distinguished. *Barker* v. *Commonwealth*, 2 Va. Cas. 122. Some misdemeanants, however, were sent to the penitentiary for so inconsiderable an offense as exhibiting an A. B. C. table. Code 1819, volume I, page 567.

By statute in Virginia, Code, section 4440, one who steals goods to the value of fifty dollars or more is guilty of grand larceny and if it be from the person five dollars or more. Of course these standards are wholly arbitrary. The Legisla-

ture might change them and it might entirely abolish such distinctions.

Until the Code of 1919 went into effect, there was no statutory provision which dealt with the status of a witness who had been convicted of a felony other than perjury and who had suffered the punishment assessed against him. So far as Virginia statutes are concerned, he stood as other witnesses stand.

In *Samuels' Case* (*Samuels* v. *Com.*) (1909), 110 Va. 901, 66 S. E. 222, 19 Ann. Cas. 380, section 522 of Wigmore on Evidence is cited with approval. It is there said that a conviction and sentence for a felony in one of the United States does not render the party incompetent as a witness in the courts of another State, although that fact might be shown in diminution of the credit due his testimony. To the same effect is Greenleaf on Evidence, section 376. Impeachment in this manner was then warranted by the law of evidence although there was no statute on the subject, but the admission of such testimony was within the sound discretion of the trial court and should have been measured by the character of the crime.

If conviction in another state may be shown in diminution of credit, then *a fortiori* evidence of conviction at home is competent, and this has been expressly decided in Virginia.

In *Davidson* v. *Watts*, 111 Va. 394, 395, 69 S. E. 328, 330, it was held that a witness who had been convicted of grand larceny and served his term was competent but that conviction might be shown to affect his credit. It was said:

"It is not consistent with the interests of others, nor the protection which is due to them from the State, that they should be exposed to the peril of testimony of persons who have been convicted of offenses which affect their character for truth without permitting such fact to be brought to the attention of the jury. See Mr. Hargrave's Judicial Arguments, volume 2, page 221, referred to in note 1, page 425, I Greenleaf on Ev. (Redfield's Ed.)."

So far as they affect this case, none of the statutes

antedating the Code of 1919 differ from each other. They make men who have been convicted and punished for felony competent witnesses and leave them as such to the general law of evidence. Former relevant convictions of felonies could be shown, but not those which could have no bearing upon the case at issue. It would have been an abuse of discretion to show that one on trial for larceny had before then been convicted of involuntary manslaughter, done in hot blood and in sudden combat.

In *Davidson* v. *Watts, supra,* evidence of a former conviction was admitted, not because it was a felonious offense for the court said "there are some felonious offenses, which do not involve the perpetrator's character for truth," but because of the nature of the offense; there the former conviction appeared to have been for grand larceny, and the court in commenting upon it further said "there are few crimes which imply a greater dereliction of moral principles than stealing." This dereliction does not rest upon the amount stolen but upon the fact that a theft has been committed. One who steals a flock of sheep is not more derelict than one who steals a sheep a day until he is too old to walk around.

In England, after convicts were made competent witnesses, the statutes which conferred upon them this privilege sanctioned the use of convictions for all kinds of crimes by way of impeachment.

"A witness in any cause may be questioned as to whether he has been convicted of any felony or misdemeanor; and, upon being so questioned, if he either denies the fact or refuses to answer, it shall be lawful for the opposite party to prove such conviction," St. 28 Vict. chapter 18, section 6 (1865), and it was not until 1898 that this right was expressly repealed, St. 61 & 62 Vict. chapter 36, section 1, although even now the record of a convict is scanned after verdict and before sentence is pronounced.

There was no statute in Virginia which governs this practice and so on principle we are thrown back to common law and to the general rules of evidence. And this is true both

as to felonies and as to misdemeanors. Evidence of larceny involves "the perpetrator's character for truth." *Davidson v. Watts, supra*.

All the recent cases which exclude evidence of this character go back to *Uhl's Case*, 6 Gratt. (47 Va.) 706. There to discredit a witness for the Commonwealth, the defendants offered in evidence a record of his conviction in the state of Ohio for petit larceny. It was not admitted. No reason was given. It may have been because it was the record of a conviction in another state; some courts have so held. It may have been because it was evidence of some extraneous fact, and it may have been because the court thought that a witness came into court prepared only to defend his general reputation and not to explain away independent incidents; in short, that he was taken by surprise. And it may have been because it was the record of a conviction for petit larceny. We do not know. The first two reasons suggested have no application in the instant case. To the third Professor Wigmore makes this conclusive answer:

"The reasons already examined (ante, section 979) appear plainly to have no effect in forbidding the extraction of the facts of misconduct from the witness himself upon cross-examination. (a) There is no danger of Confusion of Issues, because the matter stops with question and answer; (b) There is no danger of Unfair Surprise, because the impeached witness is not obliged to be ready with other witnesses to answer the extrinsic testimony of the opponent, for there is none to be answered, and because, so far as the witness himself is concerned, he may not unfairly be expected to be ready to know and to answer as to his own deeds. Thus, neither of the reasons has any application, and hence, so far as they are concerned, the opponent is at liberty to bring out the desired facts by cross-examination and answer of the witness himself to be impeached." Wigmore on Evidence, volume 2, section 981.

And lastly, stealing is a crime "of that character which men generally are not found to commit unless when so

depraved as to render it extremely probable that he will not speak the truth." *Davidson* v. *Watts, supra.*

Judge Buchanan thought that the crime was infamous.

This question next arose in *Langhorne* v. *Commonwealth*, 76 Va. 1012. Langhorne was indicted for burning a tobacco factory. Edward Penn, who testified for him, was asked in cross-examination: "Were you not arrested, tried and convicted before a magistrate's court in the city of Lynchburg?" The character of this misdemeanor does not appear and particularly it does not appear that it was a crime affecting credibility. The court very properly refused to admit this evidence and for those reasons.

In *Barbour* v. *Commonwealth*, 80 Va. 287, Barbour was on trial for murder. Robert Lewis was called as a witness. The admissibility of his testimony was questioned upon the ground that he had been convicted for petit larceny. The court said the issue presented was this: "Q. Does a conviction of petit larceny disqualify a witness when qualifying in a future case?" Plainly this conviction did not make him incompetent as a witness. After his competency had been established, there was an attempt to impeach him by proving particular acts and offenses. This the court refused to permit. It does not appear that this was a matter brought out in cross-examination. If such attempted impeachment was by extraneous evidence, it was properly refused.

In *Cutchin* v. *Roanoke*, 113 Va. 452, 74 S. E. 403, the court rejected evidence offered to prove the unchastity of a female witness.

In *Allen* v. *Commonwealth*, 122 Va. 834, 94 S. E. 783, 785, the accused was on trial for larceny. A witness for the Commonwealth was asked this question: "Q. Isn't it a fact that you had your buggy injured by a gentleman on the outside, and that you had it repaired at J. A. Lewis' and that he handed you a bill for six dollars, and you asked him to raise it to twelve dollars, so that you could get the entire twelve dollars, and that you did collect the twelve dollars, although the repairs were only six dollars?" This question the trial court held

to be improper, and it was held to be improper on an appeal by Prentis, J., who in support of the judgment cited *Uhl's Case*. It will be observed that there was no judgment of conviction for petit larceny here, or for anything else.

 Counsel for the accused relies strongly upon *Harold v. Commonwealth*, 147 Va. 617, 136 S. E. 658, 660. The defendant on cross-examination was asked why he was discharged from the army and answered that he had been arrested in Washington because there was whiskey in his car; that he was convicted, sent to jail and discharged from the army for that reason. It will be observed that this conviction was not for an offense indicative of moral turpitude. The court said: "Whatever may be the rule elsewhere, it is well settled in this State that the character of a witness for veracity cannot be impeached by proof of a prior conviction of crime, unless the crime be one which *involved the character of the witness for veracity*." (Italics supplied). And with this general statement of the law, we are in cordial accord. Nowhere out of court would the word of a convicted thief be accepted without question.

In *Fenner v. Commonwealth*, 152 Va. 1014, 148 S. E. 821, the court said it was error but harmless error tending to show that a woman witness of the Commonwealth was of immoral character. It was error for a number of reasons; it was an attempt to prove a collateral matter by extraneous evidence. Evidence of such matters and evidence in rebuttal would lead to endless confusion. A jury might forget what it was called upon to decide.

We have not undertaken to review decisions from other states. It would be an endless and a fruitless task.

In some of the cases there are expressions of opinion which would seem to indicate that such testimony was inadmissible. In their review, however, we have undertaken to deal only with matters actually in issue and with decisions actually made.

 In *Smith v. Commonwealth*, 155 Va. 1111, 156 S. E. 577, we said it was not proper to show by a witness himself

that he had been convicted of an ordinary misdemeanor. It was not our purpose to thereby in any manner indicate that he could not be asked if he had been convicted of a misdemeanor involving moral turpitude. It follows that the character of the misdemeanor must be weighed by the trial judge, when the inadmissibility of such evidence is challenged.

At common law simple larceny of whatever degree has been held to be a felony and those rules of evidence which dealt with competency and impeachment applied alike to all cases until modified by express acts of Parliament. We have held, independent of statute, that conviction for an infamous crime might be shown by way of impeachment. The reason for such rule lies in the nature of the crime itself and not in the quantum of punishment suffered. The Legislature has the power to abolish capital punishment and to do away with its penitentiary. It has the power to declare that, so far as the laws of this State are concerned, all crimes thereafter committed shall be misdemeanors only, but plainly, in the absence of some other statute, this would not thereafter prevent the impeachment of a witness who had been convicted of a crime involving moral turpitude. As a matter of fact the Legislature has nowhere undertaken to deal with the moral status of such an offender. Indeed it could not, though it could change the legal effect of such delinquencies. So far as punishments and disabilities are concerned a distinction has been made. Punishments vary and statutory disabilities are imposed upon felons which misdemeanants do not have to bear, but the law of evidence has been left untouched, save only in this, felons who were incompetent witnesses are now competent, subject to conditions directly imposed.

The Virginia statutes, cited *supra*, dealt only with the competency of convict felons, who, without them, were wholly incompetent. There was no occasion to deal with misdemeanors for misdemeanant convicts were already competent witnesses, subject, as we have seen, to impeachment.

In the instant case the issue is narrow. Can a witness on cross-examination be asked if he has been convicted of stealing? We think he can, for it was said by Judge Buch-

anan in *Davidson* v. *Watts, supra,* that few crimes are baser than larceny or discredit more the credibility of a witness.

In the petition for a writ of error is this second assignment:

"Sheriff of the county being permitted to testify after the defendant had rested, placing a dying declaration of the deceased in evidence which had not been previously alluded to in the trial."

The contention there made is supported by this argument:

"Certainly no authority is needed to substantiate the fact that this was improper. Especially so when the Sheriff had been on the stand twice previously on direct testimony and had not alluded to any such dying declaration, nor had any foundation or notice for the admission of the same been laid."

Nothing more was said on that subject.

The admissibility of this declaration in evidence is not here assailed, but the order of its admissibility is.

In argument it was said that a proper foundation for its admissibility had not been laid, but this claim appears in no assignment of error. In argument, of course, assignments are enlarged upon and various reasons for their support are then advanced, but new assignments cannot be made. The petitioner's claims must first appear in his petition, which is a pleading and is its foundation.

This is what actually occurred: Harris was shot in the early part of the night. There was a hole in his abdomen the size of a silver dollar, from which his intestines protruded. He was taken to a hospital and he was told by the surgeon that his condition was desperate and that he might "pass out." The surgeon further tells us that he understood this. About that time the sheriff came in. He tells us what was said: "I asked him if he knew who it was shot him and he said yes, it was Norfleet Bell shot him, and I asked him how he knew it was him and he said because he called him, that just before he shot he called to him." An operation was then performed, but the patient did not recover consciousness and died within a short time thereafter.

Objection is made to instruction "D." It reads:

"The Court instructs the jury that a mortal wound given with a deadly weapon in the previous possession of the slayer, without any, or very slight, provocation, is *prima facie* willful, deliberate and premeditated killing, and throws upon the prisoner the necessity of showing extenuating circumstances."

This was a stock instruction many times given and approved.

Reliance is put upon *Smith* v. *Commonwealth*, 155 Va. 1111, 156 S. E. 577, 580, in which this instruction was criticized:

"The Court instructs the jury that every killing done with a deadly weapon in the previous possession of the accused is *prima facie* murder in the first degree."

It will be observed that it did not include the qualifying clause here under review. The jury should have been told in unambiguous terms that this *prima facie* presumption might be overcome by proof of extenuating circumstances. The court there went on to name some of the circumstances which might be relied upon as extenuating, such as accidental death or homicide inflicted in the heat of passion or in self-defense. What was said in the *Smith Case* means no more than that.

Bell did not undertake to show merely extenuating circumstances; indeed he did undertake to show that all he did was in self-defense.

■ Error is assigned because of the "court's refusal to instruct the jury on involuntary manslaughter and assault and battery."

Here if the evidence of the Commonwealth is to be believed, Bell is plainly guilty of first-degree murder.

If we accept his testimony and that given on his behalf, he was not guilty at all and so should not have been convicted of a crime not committed.

■ Instructions containing statements of abstract principles should never be given unless they find some support in the evidence.

■ It is perfectly true that a jury has the power to return a verdict of involuntary manslaughter in a case where first-degree murder is shown beyond controversy and such a verdict should be confirmed for this reason: The accused could not be retried for murder because he has been cleared of that

charge by the verdict for manslaughter, and if the verdict for manslaughter be not permitted to stand, he could not be punished at all.

The jury has the power to return such a verdict in such a case but not the right, and a court should not intimate by its instructions that it might return a verdict which it had not the right to return. *Burton & Conquest* v. *Commonwealth*, 108 Va. 892, 62 S. E. 376.

Finally, objection is made to the verdict's form. It reads:

"We, the jury, find the accused guilty of murder in the second degree and fix his penalty *to* twenty years in prison."

This assignment is without merit.

Bell has had one fair trial; he is entitled to no more.

There is no error in the record. For reasons stated the judgment of the court below should be affirmed, and it is so ordered.

*Affirmed.*