MELVIN F. DOWNING, Appellant, v. STATE OF DELAWARE, Appellee.

No. 54, 1961.

*John Biggs, III* (of the firm of Bader and Biggs) for appellant.

*E. Norman Veasey*, Deputy Attorney-General, for appellee.

RONALD H. THERKILDSEN, Appellant, v. STATE OF DELAWARE, Appellee.

No. 45, 1961.

*Donald W. Booker* for appellant.

*E. Norman Veasey*, Deputy Attorney-General, for appellee.

(*January* 16, 1963.)

SOUTHERLAND, Chief Justice, and WOLCOTT and TERRY, J. J., sitting.

Supreme Court of the State of Delaware.

TERRY, J.:

On April 7, 1959, the home of George Rayfield, at 107 Bellanca Lane in Collins Park near New Castle, Delaware, was damaged by an explosion. Upon arrival at the scene, officers of the State Police found, in the damaged kitchen of the Rayfield home, two jugs which appeared to contain a gas-oil mixture. A piece of cloth saturated with the liquid was found in the necks of both jugs. On August 6, 1959, the State Police questioned Ronald Therkildsen. From information given to them by Therkildsen, the officer in charge of the investigation directed other detectives of his command to contact those individuals who were implicated by the disclosures given by Therkildsen. The officers were specifically instructed to refrain from using any force to compel the attendance of these individuals. In compliance with these instructions, two detectives went to the home of appellant Downing. The officers informed Downing that his presence was desired at police headquarters, and neither used the word "arrest" nor volunteered the information they were under instructions not to compel him to accompany them.

At trial, a conflict in testimony developed during the *voir dire* examination of the officers. Downing testified that he informed the officers that he could not leave because there would be no one in his home to care for his 12-year-old brother and his infant child. The officers testified that Downing had informed them that his brother was 16 years of age and fully competent to care for his child. There was no evi-

dence of physical coercion, and both officers testified that Downing voluntarily accompanied them to State Police Headquarters.

At the State Police Headquarters, Downing was confronted by Therkildsen, who repeated his accusations directly to Downing. Downing, in reply, stated:"Boy, how can you say that? I have only seen you a couple of times." Therkildsen subsequently was taken from Downing's presence, and Downing, a short time thereafter, began to cry and, after he had composed himself, executed a confession implicating himself in the Rayfield explosion. Subsequently, Downing was taken to another room in the State Police building, and the confessions of certain of the other defendants, which implicated him, were read aloud in his presence. Downing remained silent during the reading of these statements.

Five men were indicted and tried on several charges, including conspiracy to commit malicious mischief. The evidence tended to show that Gilbert Minnick and Melvin Downing went to Frostburg, Maryland and bought dynamite, and that they broke into the Rayfield house and arranged the explosion of the dynamite. Albert Reverdito drove them there. Ronald Therkildsen's connection will be hereafter discussed. William Charlton, the fifth man, was acquitted by direction of the court.

Downing was indicted and convicted of burglary in the third degree, malicious mischief, attempting to burn, and conspiracy to commit malicious mischief. Following dismissal of the other charges laid against him, defendant Therkildsen was convicted upon the charge of conspiracy to commit malicious mischief. It is from these verdicts that the defendants Downing and Therkildsen prosecute these appeals. Both appeals have been consolidated for disposition by this opinion. For reasons of convenience, we shall consider the appeal of Downing first.

■■ Downing first assigns as error the refusal of the trial court to exclude his confession on the ground that it was taken while he was in an illegal arrest status. It is, of course, true that evidence obtained as a result of an illegal arrest is inadmissible in the courts of this jurisdiction. (*Rickards v. State*, 6 Terry 573, 77 A. 2d 199 [S. Ct., 1950]). However, we are of the opinion that the trial court was justified in concluding that no arrest had taken place prior to the execution of the statement. The legislature has provided the controlling standard for determining the nature of an arrest:

" 'Arrest' is the taking of a person into custody in order that he may be forthcoming to answer for the commission of a crime" (11 *Del. C.* § 1901).

See also *Cannon v. State*, 3 Storey 284, 168 A. 2d 108 (S. Ct., 1961).

This legislative standard corresponds to the judicial definition given by this court in *Garner v. State*, 1 Storey 301, 145 A. 2d 68 (S. Ct., 1958), wherein we defined an "arrest" as "a restraint of liberty." In the instant case, the officers testified, as did their superior officer, that they were under clear and explicit instruction not to compel the attendance of Downing. Neither of the officers informed Downing that he was compelled to attend, and the word "arrest" was not used. Although Downing testified, on *voir dire*, that he believed that he had no alternative but to accompany the officers, the determination of whether or not an arrest has in fact been made cannot be predicated upon the opinion of Downing, rather, it must rest upon a determination of whether or not the officers did in fact attempt to restrain the liberty or freedom of movement of Downing.

Downing's reliance upon *Morton v. U. S.*, 79 U. S. App. D. C. 329, 147 F. 2d 28 (D. C. Cir., 1945); cert. den. 324 U. S. 875, 65 S. Ct. 1015, 89 L. Ed. 1428, is misplaced. In *Morton*, the officers had no instructions to allow the suspect

to remain in his home, but, rather, were under orders to procure his attendance at the police station.

In view of our conclusion reached above, we deem it unnecessary to decide whether or not probable cause existed for an arrest at the time that Downing went to State Police Headquarters. See *Henry v. U. S.*, 361 U. S. 98, 80 S. Ct. 168, 4 L. Ed. 2d 134 (1959). However, we note that the state would not be bound by the opinion of the officer in charge that the statement of Therkildsen implicating Downing did not constitute probable cause.

■ Downing's second assignment of error is the allegation that the trial court failed to instruct the jury to disregard his confession if the jury found it to be coerced. The trial court instructed the jury in the following manner:

"A free and voluntary confession is, generally speaking, deserving of the highest credit because a confession is against the interest of the person making it and is presumed to flow from a sense of guilt. It is for the court to determine whether or not a confession is admissible in evidence, but it is for the jury to estimate the weight and credit to be given to it upon a consideration of all the facts of the case, and particularly the circumstances under which the confession was given."

■■ It is, of course, true that a coerced confession must be entirely disregarded by the triers of the facts. See *Rogers v. Richmond*, 365 U. S. 534, 81 S. Ct. 735, 5 L. Ed. 2d 760 (1961). It is also true that the normal practice would be to instruct the jury not only on its duty with respect to a voluntary confession, but also with respect to a coerced confession. See *State v. Brinte*, 4 Pennewill 551, 58 A. 258, Court of Oyer and Terminer (1904); and *State v. Anderson*, 208 N. C. 771; 182 S. E. 643 (1935).

■■ However, the United States Supreme Court has made it clear that the decision as to whether the trial court

or the jury shall be the trier of the fact upon the issue of coercion is a matter of local practice. See *Rogers v. Richmond*, cited *supra*. In the instant case, Downing elected to testify before the trial court on *voir dire* examination. His statements were contradicted in all material areas by the officers who came to his home and who conducted the interrogation. The trial court was clearly warranted in resolving the issue of coercion against the defendant.

Subsequent to the *voir dire* examination, the officers repeated their testimony before the jury, but the defendant elected to remain silent. Downing offered in evidence certain medical records concerning his admission to a Veterans Administration Hospital in 1956, which purported to show that at that time he was extremely anxious and upset. The trial court, in a proper exercise of discretion, excluded this evidence on the grounds it was too remote to the instant question. Therefore, there was no conflict in evidence before the jury on the issue of coercion, and, accordingly, there was no need to instruct the jury on its duty with respect to a coerced confession. See *Wilson v. State*, 10 Terry 37, 109 A. 2d 381 (Supreme Court, 1954).

Downing's third assignment of error is the failure of the trial court to exclude evidence of Therkildsen's accusations made in his presence. It is clear that a denial precludes the use of an adoptive admission (*State v. Bryson*, 8 Terry 106, 87 A. 2d 640 (Superior Ct., 1952). The evidence clearly shows that Downing denied Therkildsen's accusations, and several minutes after Therkildsen had left the room, executed a written confession. It is an unreasonable and unwarranted extension of the adoptive admission rule to hold that the fact that Downing executed a confession several minutes after denying an accusation vitiates the effect of this denial. Accordingly, we hold that it was error to admit this accusation as to appellant. However, in view of the fact that the

confession of Downing was properly admitted, we are of the opinion that the error was harmless.

■ Downing's final assignment of error is the admission into evidence against him of the confession of one of the co-defendants. As noted, *supra*, these confessions were read aloud in the presence of the defendants, and each remained silent. Downing complains that the purpose of the reading of these confessions was not to extract further admission from him, but rather to extract a confession from the one defendant who had refused to execute a statement. However, since the trial court properly instructed the jury on the appropriate standards to be used in weighing an adoptive admission, and since there was no evidence that defendant Downing was prevented from speaking, the admission of this evidence was entirely proper. See *Edwards v. State*, 155 Fla. 550, 20 So. 2d 916 (Florida Supreme Ct., 1945).

■ We turn now to the appeal of defendant Therkildsen. Appellant contends that the evidence is insufficient to warrant his conviction on the charge of conspiracy.

That a conspiracy existed between Downing, Minnick, and Reverdito seems clear. Downing and Minnick entered the house and Reverdito drove them there.

But there is no evidence to connect Therkildsen with the conspiracy except his own statement.

In pertinent part he admitted the following:

"That he, Therkildsen, a couple of nights before the Rayfield home was destroyed, was working at Charlton's Atlantic Service Station when Minnick and a man known as 'Hill Billy'[1] and 'Florida'[1] and another man[2] who lives along side of Minnick came into the service station. The men

---

[1]Melvin F. Downing.
[2]Albert L. Reverdito.

brought with them a can and the man known as 'Hill Billy' asked Charlton, the service station proprietor, to make up some Molotov Cocktails for them. Charlton told him (Therkildsen) to take the can and fill it about half full with ninety weight oil. This he (Therkildsen) did and gave the can to Charlton. Two days later when he (Therkildsen) was working at the service station Charlton asked him to open the safe and remove a burlap bag which Charlton said contained three sticks of dynamite, which Charlton in turn gave to 'Hill Billy.' Charlton could not open the safe because he did not know the combination—the safe was one that he (Therkildsen) had loaned him. He (Therkildsen) further stated that during the early evening of April 7, 1959, 'Hill Billy' asked him to accompany them to attempt to destroy the Rayfield home to which he replied, 'I do not want anything to do with something like that'."

There is nothing of substance to show that these actions involved guilty knowledge. In filling the oil can Therkildsen was only carrying out an order of his employer. There is nothing to show Therkildsen knew that there was dynamite in the burlap bag, or indeed to show that it was Therkildsen who had put the bag in the safe. When Downing suggested that he go with them, he refused.

The judgment of the court below in the case of *Melvin F. Downing v. The State of Delaware*, No. 54, 1961, is affirmed.

The judgment of the court below in the case of *Ronald H. Therkildsen v. The State of Delaware*, No. 45, 1961, is reversed.